WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Dina Galassini, | No. CV-11-02097-PHX-JAT |
| Plaintiff, | **ORDER** |
| v. | |
| Town of Fountain Hills, | |
| Defendant, | |
| State of Arizona, | |
| Intervenor-Defendant | |

Pending before the Court are: (1) Plaintiff's Motion for Summary Judgment (Doc. 82); (2) the State of Arizona's Motion for Summary Judgment (Doc. 83); and (3) the Town of Fountain Hills' Motion for Summary Judgment (Doc. 84). The Court now rules on the Motions.

## I.    BACKGROUND

Upset over the tax consequences of an upcoming bond proposal by the Town of Fountain Hills, Plaintiff Dina Galassini decided to exercise the rights of an ordinary citizen and organize a protest. Little did she realize that she was about to feel the heavy hand of government regulation in a way she never imagined. At center stage is Plaintiff's challenge to the constitutionality of a 183-word sentence defining "political committee," which raises the issue of whether a person of ordinary intelligence can understand the sentence's meaning.

1      Ms. Galassini opposed a bond proposal on the Town of Fountain Hills' November

2    2011 ballot.  (Doc. 82-2 at ¶¶ 1-2; Doc. 94-1 at ¶¶ 1-2).  Ms. Galassini attended town

3    council meetings and spoke out against the bond proposal.  (Doc. 82-2 at ¶ 2; Doc. 94-1

4    at ¶ 2).   On October 6, 2011, Ms. Galassini sent an email to 23 of her friends and

5    neighbors in an effort to organize a rally to oppose the bond.  (Doc. 82-2 at ¶ 4; Doc. 94-1

6    at ¶ 4).  In her email, Ms. Galassini wrote:

> Dear Fountain Hills Residents,
>
> This email is going out to 23 residents.  Please feel free to forward this email and/or send me email addresses of people who wish to be on this contact list, BUT PLEASE CONTINUE TO PROTECT THE PRIVACY OF EMAIL ADDRESSES by using the Bcc box.  Thank you.
>
> As you know there are several issues regarding the upcoming SPECIAL BOND ELECTION to be held on November 8.  **THIS IS A MAIL IN ELECTION ONLY**.  Ballots are to be mailed out staring [sic] October 17, SO WE NEED TO GET ORGANIZED AND ACT FAST.
>
> **ACTION PLAN** – Time is of the essence!
>
> **TWO PROTESTS ARE PLANNED**—Please mark your calendars and come ON TIME with SIGNS:
> October 19th at 4-6pm at the corner of Palisades and Palomino.
>
> October 22nd at NOON to 3:00pm at Saguaro and Avenue of the Fountains.
>
> **PLEASE WRITE LETTERS—START NOW AS THERE IS ONLY FOUR WEEKS TO POST.**
>
> Submit by Friday or Saturday TO THE EDITOR EACH WEEK – mike@fhtimes.com
>
> **The estimated total cost of the proposed bond authorization, including principal and interest is $44,404,598**.

**The Town currently has $4.6 MILLION general obligation bonds OUTSTANDING. The new bonds will first liquidate existing indebtedness that is already incurred**.

Isn't this robbing Peter to pay Paul?

The bonds will mature over a period not to exceed 25 years from the date of issuance. Every 10 years, **the Town is most likely going to want more money, meaning more bonds**.

The Town is hitting residents hard while property tax rate is lower indeed, but property taxes have not decreased substantially to reflect this. Bonds would be payable from the levy of an ad valorem tax against residents taxable property. Will your tax rate stay constant? Will your taxes ever go down? Each and every resident will be responsible for the annual debt service of these bonds!

The bond will provide funds for any "**appurtenances thereto**." This is vague. Appurtenance means accessory objects and that which belongs to something else. Something annexed to another thing more worthy.

The bonds may be issued in one or more series with a fixed or variable interest rate not to exceed 12% per annum. This is an exceedingly high interest rate that residents will pay and pay dearly. How many homes have gone into default with a variable rate?

The bond will provide funds for so many things, I can see this money getting eaten up in a nanosecond!

-to design, improve, construct, reconstruct and rehabilitate the streets, avenues, alleys and highways, including any appurtenances thereto, of or within the Town.

-to design, acquire, install, construct and reconstruct street lighting (what is the cost of each traffic light?). Why would our existing lights need reconstructed [sic]? Don't forget the traffic signal/control systems and underground utility lines.

-to acquire land and interests in land for transportation

-fund landscape improvements

**DOES ANYONE KNOW WHAT THIS MEANS?**

Although all of the projects qualify under the 20% debt limit, they <u>can also be issued</u> under the 6% general bond limit.  In the event you sell your home, it will be less attractive with a high property tax affixed to it.
I heard the Town has one guy who maintains our traffic light. He broke his arm, so the Town pays another city to maintain them.

Three restaurants closed in one week.  People are struggling . . . not thriving.  JUST SAY NO TO THE BONDS!

**SIGNS ARE NEEDED:**
Bonds are BONDAGE
Keep Property Taxes Low
No to the Ball and Chain Bond
Vote NO on the Bond
Vote No on Nov 8

Feel free to forward me any findings you may have on this issue.

Dina Galassini
[telephone number redacted]

(Doc. 82-3 at Exhibit 1) (emphasis in original).

Ms. Galassini's email was forwarded to Paul Mood through a consultant who was working on plans for road maintenance for the Town of Fountain Hills.  (Doc. 82-2 at ¶ 14; Doc. 94-1 at ¶ 14).  Mr. Mood is the Development Services Director for the Town of Fountain Hills and his department oversees road maintenance in Fountain Hills.  (Doc. 82-2 at ¶¶ 9-10; Doc. 94-1 at ¶¶ 9-10).  Mr. Mood helped put the bond package together. (Doc. 82-2 at ¶ 12; Doc. 94-1 at ¶ 12).  Mr. Mood forwarded the email to Julie Ghetti, the Interim Town Manager for Fountain Hills, Andrew McGuire, the Fountain Hills Town Attorney, and another group of Town employees.  (Doc. 82-2 at ¶¶ 15-16; Doc. 94-1 at ¶

- 4 -

15-16).

Ms. Ghetti and Janice Baxter, an executive assistant in Mr. Mood's department, then forwarded the email to Bevelyn Bender, the Town Clerk of Fountain Hills.  (Doc. 82-2 at ¶ 17; Doc. 94-1 at ¶ 17).  Ms. Bender and Ms. Ghetti then consulted with the Town Attorney and decided that Ms. Bender would write a letter to Ms. Galassini.  (Doc. 82-2 at ¶¶ 18-19; Doc. 94-1 at ¶¶ 18-19).

In the letter, dated October 12, 2011, Ms. Bender wrote:

> Dear Ms. Galassini:
>
> A recent email was brought to my attention that called for organized action by numerous individuals regarding the November 8, 2011 Bond Election.
>
> Although an individual acting alone is not a political committee under Arizona law and need not file a statement of organization, if any additional person or persons join the effort (as defined in A.R.S. §16-901(19) - see below) begun by an individual, the association of persons has become a "political committee" under Arizona law, and must file a statement of organization before accepting contributions, making expenditures, distributing literature or circulating petitions.
>
> Please be advised that according to State Statutes, as specifically outlined in Title 16, one or more persons working to impact the results of an election are considered to be a Political Action Committee (PAC) subject to all of the requirements associated with a PAC. In order to comply with the law a Statement of Organization must be filed in the office of the Town Clerk prior to **any** electioneering taking place. I would strongly encourage you to cease any campaign related activities until the requirements of the law have been met.
>
> *Arizona Revised Statute A.R.S. §16-901(19):*
>
> *"Political committee" means a candidate or any association or combination of persons that is organized, conducted or combined for the purpose of influencing the result of any*

*election or to determine whether an individual will become a candidate for election in this state or in any county, city, town, district or precinct in this state, that engages in political activity in behalf of or against a candidate for election or retention or in support of or opposition to an initiative, referendum or recall or any other measure or proposition and that applies for a serial number and circulates petitions and, in the case of a candidate for public office except those exempt pursuant to section 16-903, that receives contributions or makes expenditures in connection therewith, notwithstanding that the association or combination of persons may be part of a larger association, combination of persons or sponsoring organization not primarily organized, conducted or combined for the purpose of influencing the result of any election in this state or*

*in any county, city, town or precinct in this state. Political committee includes the following types of committees:*

*(a) A candidate's campaign committee.*
*(b) A separate, segregated fund established by a corporation or labor organization pursuant to section 16-920, subsection A, paragraph 3.*
*(c) A committee acting in support of or opposition to the qualification, passage or defeat of a ballot measure, question or proposition.*
*(d) A committee organized to circulate or oppose a recall petition or to influence the result of a recall election.*
*(e) A political party.*
*(f) A committee organized for the purpose of making independent expenditures.*
*(g) A committee organized in support of or opposition to one or more candidates.*
*(h) A political organization.*
*(i) An exploratory committee.*

Please contact the Town Clerk's office as soon as possible at [telephone number redacted] to schedule an appointment to meet with staff so that we can provide you with the necessary forms to be filed and informational materials that will assist you. I look forward to meeting with you and thank you for your prompt attention to this important matter.

Respectfully,

1

2          Bevelyn J. Bender, MMC
           Town Clerk
3

4    (Doc. 82-3 at Exhibit 2) (emphasis in original).

5          Upon receiving the letter on October 13, 2011, Ms. Galassini became scared of

6    breaking the law and decided to cancel her two protest rallies.  (Doc. 82-2 at ¶¶ 22-23;

7    Doc. 94-1 at ¶¶ 22-23).  The same day, she sent Ms. Bender a letter stating:

8          Hi Bev,
           Just received your letter.  I had no idea I would be violating
9          the law.  I will stop all emails out and not hold a rally.  It isn't
           the good 'ol days anymore.
10         Is it OK to send an email out to let people know that it is
           canceled due to A.R.S. 16-901(19)?
11         Dina Galassini

12
13   (Doc. 82-3 at Exhibit 3).

14         In the following week, Ms. Galassini sent Ms. Bender a few more emails asking

15   for clarification on the law and inquiring as to her First Amendment rights.  (Doc. 82-2 at

16   ¶¶ 25-29; Doc. 94-1 at ¶¶ 25-29).

17         On October 26, 2011, Plaintiff filed a Complaint for Declaratory and Injunctive

18   Relief against the Town of Fountain Hills, the Town Clerk of Fountain Hills, and the

19   Town Attorney of Fountain Hills.  (Doc. 1).  In her Complaint, Plaintiff alleged that

20   Arizona Revised Statutes section 16-901(19) is an unconstitutional burden on her First

21   Amendment rights to freedom of speech and freedom of association.  (*Id.*).  Thereafter,

22   the State of Arizona intervened.  (Doc. 13; Doc. 18).  Following a preliminary injunction

23   hearing, the Court found that Plaintiff established serious questions going to the merits of

24   her claim.  (Doc. 33 at 8-9).  As a result, the Court granted Plaintiff's Motion for

25   Preliminary Injunction, allowing Plaintiff to hold protests prior to the election on

26   November 8, 2011 without first registering as a political action committee.  (*Id.* at 10-11).

27         On November 6, 2011, Ms. Galassini held a rally with 12-14 other people.  (Doc.

28   82-2 at ¶¶ 69-71; Doc. 94-1 at ¶¶ 69-71).  Ms. Galassini and others displayed homemade

1    signs to cars and passersby.   (Doc. 82-2 at ¶¶ 72-73; Doc. 94-1 at ¶¶ 72-73).   The

2    preliminary injunction expired at the close of the November 8, 2011 election.   (Doc. 33 at

3    11).   The bond proposal was rejected by the Fountain Hills voters.   (Doc. 82-2 at ¶ 74;

4    Doc. 94-1 at ¶ 74).

5         Thereafter, Plaintiff filed an Amended Complaint pursuant to 42 U.S.C. § 1983

6    against the Town of Fountain Hills and the State of Arizona.   (Doc. 65).   In her Amended

7    Complaint, Plaintiff alleges that (1) Arizona's campaign-finance laws impose

8    unconstitutional burdens on free speech; (2) Arizona's campaign finance scheme is

9    overbroad in violation of the First and Fourteenth Amendments of the United States

10   Constitution; and (3) Arizona's campaign finance scheme is impermissibly vague in

11   violation of the Fourteenth Amendment of the United States Constitution.   (*Id.*).

12   Plaintiff seeks injunctive and declaratory relief prohibiting the enforcement of the State's

13   campaign-finance laws.   (*Id.*).   Plaintiff also seeks nominal damages and attorneys' fees

14   on her 42 U.S.C. § 1983 claims.

15        The Arizona Legislature then amended the definition of "political committee" as

16   set forth in Arizona Revised Statutes section 16-901(19).[1]   The relevant portions of the

17   ───────────────────

18        [1]   Plaintiff's complaint does not challenge the amended version of the statutory
     scheme.   However, Plaintiff moved for summary judgment based on the current versions
19   of Arizona Revised Statutes sections 16-901(19) and 16-902.01.   As a result, the Court
     requested supplemental briefing and ordered the Parties to address the fact that the
20   constitutionality of the current versions of sections 16-901(19) and 16-902.01 was not
21   raised in the pleadings.   (Doc. 100).

22        In her supplemental briefing, Plaintiff argues that the statutory scheme was
     amended in a "minor way" that did not require Plaintiff to amend her complaint.   The
23   Court recognizes that the challenges to the statutory scheme's constitutionality have not
     changed, i.e. Plaintiff continues to argue that the statutory scheme violates her First
24   Amendment rights, is overly broad, and is unconstitutionally vague.   However, the
25   changes to the statutory scheme are the focus of much of the Parties' briefing on
     summary judgment, and, as discussed more fully below, the changes affect the
26   substantive analysis of Plaintiff's claims; as such, the amendments are not "minor," and,
27   thus, Plaintiff should have amended her complaint accordingly.

28        Plaintiff next argues that, pursuant to Federal Rule of Civil Procedure 15(b)(2), the

1   current version of Arizona's statutory scheme are set forth below.   Arizona Revised

2   Statutes section 16-901(19) was amended as follows:

> "Political committee" means a candidate or any association or combination of persons that is organized, conducted or combined for the purpose of influencing the result of any election or to determine whether an individual will become a candidate for election in this state or in any county, city, town, district or precinct in this state, that engages in political activity in behalf of or against a candidate for election or retention or in support of or opposition to an initiative, referendum or recall or any other measure or proposition and that applies for a serial number and circulates petitions and, in the case of a candidate for public office except those exempt pursuant to § 16-903, that receives contributions or makes expenditures **of more than two hundred fifty dollars** in connection therewith, notwithstanding that the association or combination of persons may be part of a larger association, combination of persons or sponsoring organization not primarily organized, conducted or combined for the purpose of influencing the result of any election in this state or in any county, city, town or precinct in this state. Political committee includes the following types of committees:
> (a) A candidate's campaign committee.

---

Court should recognize constructive amendment of the complaint.  Pursuant to Federal Rule of Civil Procedure 15(b)(2), "[w]hen an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings.   A party may move—at any time, even after judgment—to amend the pleadings to conform them to the evidence and to raise an unpleaded issue." Fed. R. Civ. P. 15(b)(2).   The Ninth Circuit Court of Appeals has interpreted Federal Rule of Civil Procedure 15(b)(2) to apply when the parties fully argue the merits of an unpleaded claim on summary judgment with no objection from Defendants.  *See Lone Star Sec. & Video, Inc. v. City of Los Angeles*, 584 F.3d 1232, 1235 n.2 (9th Cir. 2009).

In this case, although Defendants argue that the changes to the statutory scheme moot Plaintiff's claims and that Plaintiff does not have standing to challenge the new statutory scheme, Defendants did not object to Plaintiff moving for summary judgment on claims that were not in her complaint.   Accordingly, Defendants have impliedly consented to constructive amendment of Plaintiff's complaint pursuant to Federal Rule of Civil Procedure 15(b)(2).   Based on the foregoing, the Court will consider Plaintiff's complaint to be constructively amended to include her summary judgment arguments regarding the amended statutory scheme.

(b) A separate, segregated fund established by a corporation or labor organization pursuant to § 16-920, subsection A, paragraph 3.

(c) A committee acting in support of or opposition to the qualification, passage or defeat of a ballot measure, question or proposition.

(d) A committee organized to circulate or oppose a recall petition or to influence the result of a recall election.

(e) A political party.

(f) A committee organized for the purpose of making independent expenditures.

(g) A committee organized in support of or opposition to one or more candidates.

(h) A political organization.

(i) An exploratory committee.

Ariz. Rev. Stat. Ann. § 16-901(19) (as amended by H.B. 2033, 50th Leg., 2nd Reg. Sess. (Ariz. 2012) (amendment in bold)).  At the same time, Arizona Revised Statutes section 16-902.01 was also amended.  It provides:

> **A.**  Each political committee that intends to accept contributions or make expenditures of more than five hundred dollars shall file a statement of organization with the filing officer in the format prescribed by the filing officer before accepting contributions, making expenditures, distributing any campaign literature or circulating petitions. Each political committee that intends to accept contributions or make expenditures of five hundred dollars or less**, and more than two hundred fifty dollars,** shall file a signed exemption statement in a form prescribed by the filing officer that states that intention before making any expenditures, accepting any contributions, distributing any campaign literature or circulating petitions. If a political committee that has filed a five hundred dollar threshold exemption statement receives contributions or makes expenditures of more than five hundred dollars, that political committee shall file a statement of organization with the filing officer in the format prescribed by the filing officer within five business days after exceeding the five hundred dollar limit.
>
> **B.**  The statement of organization of a political committee shall include all of the following:

1. The name, address and type of committee.

2. The name, address, relationship and type of any sponsoring organization.

3. The names, addresses, telephone numbers, occupations and employers of the chairman and treasurer of the committee.

4. In the case of a candidate's campaign committee, the name, address, office sought and party affiliation of the candidate.

5. A listing of all banks, safety deposit boxes or other depositories used by the committee.

6. A statement that the chairman and treasurer have read all of the applicable laws relating to campaign finance and reporting.

**C.** Except as prescribed by subsection E of this section, on the filing of a statement of organization, a political committee shall be issued an identification number in the format prescribed by the filing officer.

**D.** The political committee shall file an amended statement of organization reporting any change in the information prescribed in subsections B and F of this section within five business days after the change.

**E.** A standing political committee shall file a statement of organization with the secretary of state and in each jurisdiction in which the committee is active, and only the secretary of state shall issue an identification number for the committee. The statement of organization shall include a statement with the notarized signature of the chairman or treasurer of the standing political committee that declares the committee's status as a standing political committee. The secretary of state may charge an annual fee for the filing.

**F.** For a political committee that makes expenditures in an attempt to influence the results of a ballot proposition election, the statement of organization shall include in the name of the political committee the official serial number for

the petition, if assigned, and a statement as to whether the political committee supports or opposes the passage of the ballot measure. On completion of the designation of statewide ballot propositions by number as prescribed in section 19–125, the secretary of state is authorized to and shall amend the name of the political committee by attaching to the statement of organization the ballot proposition number as a substitute for the official serial number in the name of the political committee. The secretary of state shall promptly notify the political committee of the amended political committee name and shall make that information available to the public.

Ariz. Rev. Stat. Ann. § 16-902.01 (as amended by H.B. 2033, 50th Leg., 2nd Reg. Sess. (Ariz. 2012) (amendment in bold)).  The following portions of the statutory scheme were not amended, but are relevant to the issues in this case:

"Expenditures" includes any purchase, payment, distribution, loan, advance, deposit or gift of money or anything of value made by a person for the purpose of influencing an election in this state including supporting or opposing the recall of a public officer or supporting or opposing the circulation of a petition for a ballot measure, question or proposition or the recall of a public officer and a contract, promise or agreement to make an expenditure resulting in an extension of credit and the value of any in-kind contribution received. Expenditure does not include any of the following:

(a) A news story, commentary or editorial distributed through the facilities of any telecommunications system, newspaper, magazine or other periodical publication, unless the facilities are owned or controlled by a political committee, political party or candidate.

(b) Nonpartisan activity designed to encourage individuals to vote or to register to vote.

(c) The payment by a political party of the costs of preparation, display, mailing or other distribution incurred by the party with respect to any printed slate card, sample ballot or other printed listing of three or more candidates for any public office for which an election is held, except that this subdivision does not apply to costs incurred by the party with

- 12 -

respect to a display of any listing of candidates made on any telecommunications system or in newspapers, magazines or similar types of general public political advertising.

(d) The payment by a political party of the costs of campaign materials, including pins, bumper stickers, handbills, brochures, posters, party tabloids and yard signs, used by the party in connection with volunteer activities on behalf of any nominee of the party or the payment by a state or local committee of a political party of the costs of voter registration and get-out-the-vote activities conducted by the committee if the payments are not for the costs of campaign materials or activities used in connection with any telecommunications system, newspaper, magazine, billboard, direct mail or similar type of general public communication or political advertising.

(e) Any deposit or other payment filed with the secretary of state or any other similar officer to pay any portion of the cost of printing an argument in a publicity pamphlet advocating or opposing a ballot measure.

Ariz. Rev. Stat. § 16-901(8).

"Contribution" means any gift, subscription, loan, advance or deposit of money or anything of value made for the purpose of influencing an election including supporting or opposing the recall of a public officer or supporting or opposing the circulation of a petition for a ballot measure, question or proposition or the recall of a public officer and:

(a) Includes all of the following:

(i) A contribution made to retire campaign debt.

(ii) Money or the fair market value of anything directly or indirectly given or loaned to an elected official for the purpose of defraying the expense of communications with constituents, regardless of whether the elected official has declared his candidacy.

(iii) The entire amount paid to a political committee to attend a fund-raising or other political event and the entire amount paid to a political committee as the purchase price for a fund-

raising meal or item, except that no contribution results if the actual cost of the meal or fund-raising item, based on the amount charged to the committee by the vendor, constitutes the entire amount paid by the purchaser for the meal or item, the meal or item is for the purchaser's personal use and not for resale and the actual cost is the entire amount paid by the purchaser in connection with the event. This exception does not apply to auction items.

(iv) Unless specifically exempted, the provision of goods or services without charge or at a charge that is less than the usual and normal charge for such goods and services.

(b) Does not include any of the following:

(i) The value of services provided without compensation by any individual who volunteers on behalf of a candidate, a candidate's campaign committee or any other political committee.

(ii) Money or the value of anything directly or indirectly provided to defray the expense of an elected official meeting with constituents if the elected official is engaged in the performance of the duties of his office or provided by the state or a political subdivision to an elected official for communication with constituents if the elected official is engaged in the performance of the duties of his office.

(iii) The use of real or personal property, including a church or community room used on a regular basis by members of a community for noncommercial purposes, that is obtained by an individual in the course of volunteering personal services to any candidate, candidate's committee or political party, and the cost of invitations, food and beverages voluntarily provided by an individual to any candidate, candidate's campaign committee or political party in rendering voluntary personal services on the individual's residential premises or in the church or community room for candidate-related or political party-related activities, to the extent that the cumulative value of the invitations, food and beverages provided by the individual on behalf of any single candidate does not exceed one hundred dollars with respect to any single election.

(iv) Any unreimbursed payment for personal travel expenses made by an individual who on his own behalf volunteers his personal services to a candidate.

(v) The payment by a political party for party operating expenses, party staff and personnel, party newsletters and reports, voter registration and efforts to increase voter turnout, party organization building and maintenance and printing and postage expenses for slate cards, sample ballots, other written materials that substantially promote three or more nominees of the party for public office and other election activities not related to a specific candidate, except that this item does not apply to costs incurred with respect to a display of the listing of candidates made on telecommunications systems or in newspapers, magazines or similar types of general circulation advertising.

(vi) Independent expenditures.

(vii) Monies loaned by a state bank, a federally chartered depository institution or a depository institution the deposits or accounts of which are insured by the federal deposit insurance corporation or the national credit union administration, other than an overdraft made with respect to a checking or savings account, that is made in accordance with applicable law and in the ordinary course of business. In order for this exemption to apply, this loan shall be deemed a loan by each endorser or guarantor, in that proportion of the unpaid balance that each endorser or guarantor bears to the total number of endorsers or guarantors, the loan shall be made on a basis that assures repayment, evidenced by a written instrument, shall be subject to a due date or amortization schedule and shall bear the usual and customary interest rate of the lending institution.

(viii) A gift, subscription, loan, advance or deposit of money or anything of value to a national or a state committee of a political party specifically designated to defray any cost for the construction or purchase of an office facility not acquired for the purpose of influencing the election of a candidate in any particular election.

(ix) Legal or accounting services rendered to or on behalf of a political committee or a candidate, if the only person paying for the services is the regular employer of the individual rendering the services and if the services are solely for the purpose of compliance with this title.

(x) The payment by a political party of the costs of campaign materials, including pins, bumper stickers, handbills, brochures, posters, party tabloids and yard signs, used by the party in connection with volunteer activities on behalf of any nominee of the party or the payment by a state or local committee of a political party of the costs of voter registration and get-out-the-vote activities conducted by the committee if the payments are not for the costs of campaign materials or activities used in connection with any telecommunication, newspaper, magazine, billboard, direct mail or similar type of general public communication or political advertising.

(xi) Transfers between political committees to distribute monies raised through a joint fund-raising effort in the same proportion to each committee's share of the fund-raising expenses and payments from one political committee to another in reimbursement of a committee's proportionate share of its expenses in connection with a joint fund-raising effort.

(xii) An extension of credit for goods and services made in the ordinary course of the creditor's business if the terms are substantially similar to extensions of credit to nonpolitical debtors that are of similar risk and size of obligation and if the creditor makes a commercially reasonable attempt to collect the debt, except that any extension of credit under this item made for the purpose of influencing an election that remains unsatisfied by the candidate after six months, notwithstanding good faith collection efforts by the creditor, shall be deemed receipt of a contribution by the candidate but not a contribution by the creditor.

(xiii) Interest or dividends earned by a political committee on any bank accounts, deposits or other investments of the political committee.

Ariz. Rev. Stat. Ann. § 16-901(5).

Moreover, a group's designation as a "political committee" triggers various requirements. "Each political committee shall have a chairman and treasurer. The position of chairman and treasurer of a single political committee may not be held by the same individual, except that a candidate may be chairman and treasurer of his own campaign committee." Ariz. Rev. Stat. Ann. § 16-902. "Before a political committee accepts a contribution or makes an expenditure it shall designate . . . its campaign depository" and "shall notify the filing officer of the designation . . . either at the time of filing the statement of organization pursuant to 16-902.01 or within five business days after opening an account." Ariz. Rev. Stat. Ann. § 16-902(C). Committees that have filed a five hundred dollar threshold exemption statement must, among other things, 1) maintain a record of all contributions received and expenditures made by the committee; 2) file a termination statement in conformance with § 16-914 within ninety days of the election cycle, or if it fails to file a termination statement, be fined $100; 3) preserve all records and finance reports for three years. Ariz. Rev. Stat. Ann. § 16-904. "A political committee that makes an expenditure in connection with any literature or advertisement to support or oppose a ballot proposition shall disclose and . . . shall include on the literature or advertisement the words 'paid for by,' followed by the name of the committee that appears on its statement of organization or five hundred dollar threshold exemption statement . . ." Ariz. Rev. Stat. Ann. § 16-912.01(A). For the purposes of section 16-912.01(A), "'advertisement' means general public advertising through the print and electronic media, signs, billboards and direct mail." Ariz. Rev. Stat. Ann. § 16-912.01(J).

Failure to adhere to these statutes could result in various civil penalties. *See* Ariz. Rev. Stat. Ann. § 16-924(B); Ariz. Rev. Stat. Ann. § 16-904(K); Ariz. Rev. Stat. Ann. § 16-912.01(I); Ariz. Rev. Stat. Ann. § 16-904(F)(3).

Plaintiff, the Town of Fountain Hills, and the State of Arizona now move for summary judgment on all of Plaintiff's claims.

## II.     LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support that assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits, or declarations, stipulations . . . admissions, interrogatory answers, or other materials," or by "showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *Id.* at 56(c)(1)(A)&(B). Thus, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Initially, the movant bears the burden of pointing out to the Court the basis for the motion and the elements of the causes of action upon which the non-movant will be unable to establish a genuine issue of material fact. *Id.* at 323. The burden then shifts to the non-movant to establish the existence of material fact. *Id.* The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts" by "com[ing] forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (quoting Fed. R. Civ. P. 56(e) (1963) (amended 2010)). A dispute about a fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In the summary judgment context, the Court construes all disputed facts in the light most favorable to the non-moving party. *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004).

## III.    ANALYSIS

The State of Arizona first argues that it is entitled to summary judgment because Plaintiff's claims are moot and she lacks standing. The Court will first address whether

1    Plaintiff has standing to pursue her claims because "[s]tanding is the threshold issue of

2    any federal action, a matter of jurisdiction because 'the core component of standing is an

3    essential and unchanging part of the case-or-controversy requirement of Article III.'"

4    *Local Nos. 175 & 505 Pension Trust v. Anchor Cap.*, 498 F.3d 920, 923 (9th Cir. 2007)

5    (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

6         The State of Arizona argues that Arizona's statutory scheme defining and

7    regulating political committees did not apply to Plaintiff pre-amendment and does not

8    apply to Plaintiff post-amendment.  (Doc. 83 at 2).

9                    **A.      Pre-Amendment Standing and Mootness**

10                          **1.      Pre-Amendment Standing**

11        In its Order granting Plaintiff's Motion for Preliminary Injunction, the Court found

12   that Plaintiff had standing to challenge Arizona's statutory scheme.  (Doc. 33 at 5-7).

13   The Court specifically reasoned:

14              The Fountain Hills Defendants argue that Plaintiff's claim is
15              premature.  To satisfy Article III's case or controversy
              requirement, Plaintiff must establish that she has standing to
16              sue.  To demonstrate standing, Plaintiff must show "(1) an
              injury-in-fact, (2) causation, and (3) a likelihood that the
17              injury will be redressed by a decision in the plaintiff's favor."
18              *Human Life of Washington v. Brumsickle*, 624 F.3d 990, 1000
              (9th Cir. 2010) (internal quotation omitted).  As the Court
19              cannot issue advisory opinions or decide hypothetical cases,
20              the claim must also be ripe for review.  *Id.* (internal citation
              omitted).  When a plaintiff has made a pre-enforcement
21              constitutional challenge and has not yet been penalized for
22              violating the challenged statute, "neither the mere existence
              of a proscriptive statute nor a generalized threat of
23              prosecution satisfies that 'case or controversy' requirement,"
24              but "when a challenged statute risks chilling the exercise of
              First Amendment rights, the Supreme Court has dispensed
25              with rigid standing requirements and recognized 'self-
26              censorship' as "a harm that can be realized even without an
              actual prosecution."  *Id.* at 1000 (internal quotations and
27              citations omitted).  "In an effort to avoid the chilling effect of
              sweeping restrictions, the Supreme Court has endorsed what
28              might be called a 'hold your tongue and challenge now'

approach rather than requiring litigants to speak first and take their chances with the consequences." *Lopez v. Candaele*, 630 F.3d 775, 785–786 (9th Cir. 2010) (internal quotation omitted). In such pre-enforcement cases, courts must consider three factors: (1) "whether pre-enforcement plaintiffs have failed to show a reasonable likelihood that the government will enforce the challenged law against them" (2) whether plaintiffs have established, with some concrete detail that they intend to violate the challenged law; and (3) "whether the challenged law is inapplicable to plaintiffs, either by its terms or as interpreted by the government." *Id.* at 786. If the government disavows an intent to enforce a law against a plaintiff, such disavowal "must be more than a mere litigation position."

With regard to the first factor, the Court finds that Defendant Bender's letter to Plaintiff is strong evidence that Plaintiff faces a credible threat of adverse action by the State. In *Culinary Workers v. Del Papa*, the Ninth Circuit Court of Appeals found injury in fact where the attorney general wrote a letter to the union which quoted the statute in full and threatened to refer the prosecution to local criminal authorities." 200 F.3d 614 (9th Cir. 1999). Defendant Bender's letter to Plaintiff similarly quoted the statute and informed her that "one or more persons working to impact the results of an election are considered to be a Political Action Committee (PAC) subject to all the requirements associated with a PAC." Although Defendant Bender's letter did not threaten to refer the matter to the City Attorney, it did "strongly encourage" Plaintiff to "cease any campaign related activities until the requirements of the law have been met." During the Preliminary Injunction hearing before this Court, Plaintiff testified that, as soon as she received this letter, she decided to call off her planned protests because "I had no idea I'd be violating the law" and "I didn't know if I'd be fined or jailed or what was going to happen." The Court finds that this warning to Plaintiff was reasonably interpreted by Plaintiff as a credible threat that, if she were to continue with her proposed protests, she would be in violation of the law, unless she first registered as a political action committee. *See id.* ("We also reject the contention that the attorney general's letter was not a 'genuine threat' because it failed to 'chill' the union's exercise of First Amendment rights. There is no

dispute that the union stopped distributing the contested handbill as soon as it received the attorney general's letter. This is substantially more than a subjective chilling effect."). Accordingly, Plaintiff has adequately established the first factor.

With regard to the second factor, both in her email and through testimony during the Preliminary Injunction hearing, Plaintiff established, in concrete detail, the nature of the activities she planned to engage in. During the Preliminary Injunction hearing, two witnesses testified that they planned to go to Plaintiff's protests, as proposed in her email. While there is some disagreement among the State of Arizona and the Fountain Hills Defendants as to whether those activities would actually meet the definition of "political committee," the description of a political committee urged by the Town Clerk, which the State of Arizona seems to concede is correct, suggests that if Plaintiff were to engage in her protests, she would be violating the law, unless she first registered her group as a political committee. The Court finds that there is at least a strong argument that Plaintiff's proposed activities would violate the challenged law. Such a strong argument supports Plaintiff's decision to self-censor, rather than risk violating the challenged law. Accordingly, Plaintiff has met the second element.

With regard to the third factor, as the Court has previously pointed out, the State of Arizona and the Fountain Hills Defendants seemingly disagree as to the interpretation of the law. Because Defendants do not agree as to whether the law applies to Plaintiffs' actions, it is difficult for the Court to engage in a traditional analysis of this factor. However, it seems to be undisputed [] that, if the Court finds that the requirements of the statutory scheme contained in Title 16 of the Arizona Revised Statutes do apply to Plaintiff, they would be enforced against her. There has certainly been no suggestion to the Court that these laws have not been enforced in the past or that there is a plan to not enforce them in the future. As pointed out above, based on Defendant Bender's letter to her and her proposed activities, Plaintiff has established a strong possibility that her planned protests would violate the statutory scheme. Because this has

1          reasonably caused Plaintiff to self-censor, the Court finds that
2          Plaintiff has established the third factor.

3                  For the foregoing reasons, the Court finds that Plaintiff
4          has satisfied Article III's case or controversy requirement.

5     (Doc. 33 at 5-7).

6          Nothing in the Parties' Motions for Summary Judgment changes the Court's

7     analysis or conclusions with regard to that analysis.

8          The State argues that the pre-amendment statutory scheme never applied to

9     Plaintiff based on admissions Plaintiff made after the preliminary injunction entered in

10    this case.  (Doc. 83 at 7 n.2).  Namely, the State points to Ms. Galassini's "uncontradicted

11    testimony" "that she had no intent" to form a political committee, and "created no such

12    group."   The State argues that "under the plain meaning of § 16-901(19), Plaintiff did

13    not, as a matter of law, form a political committee as there is no evidence that a group of

14    people 'organized, conducted, or combined for the purpose of influencing the results of

15    an election.'"  (Doc. 83 at 8 (quoting Ariz. Rev. Stat. § 16-901(19)).

16         As discussed above, it is undisputed that Plaintiff sent an email to her friends and

17    neighbors inviting them to join her to protest a Town of Fountain Hills' bond measure on

18    the ballot for the upcoming election.  It is further undisputed that, on November 6, 2011,

19    Ms. Galassini held a rally to protest the bond measure with 12-14 other people and that

20    Ms. Galassini and others displayed homemade signs to cars and passersby.  It is likewise

21    undisputed that Ms. Galassini had no intention of creating any kind of political

22    committee, but only wanted to attend the planned protests with her "neighbors and

23    friends" (Doc. 85 at ¶¶ 35-39; Doc. 90-1 at ¶ 35-39) and Ms. Galassini did not know all

24    of the people that attended the November protest.  (Doc. 85 at ¶ 49; Doc. 90-1 at ¶ 49).

25         In light of these undisputed facts, the Court does not understand the State's

26    argument that there is "no evidence that a group of people organized, conducted, or

27    combined for the purpose of influencing the results of an election."  The only apparent

28    explanation that the State offers to support this argument is that the State somehow reads

the statutory definition of political committee to require an "intent" to form a political committee as a prerequisite to forming a political committee.  The State's interpretation of the statute is not supported by the statute's plain language.

The ultimate conclusion as to whether Plaintiff formed a political committee under the statute is legal in nature.  The State's argument that Plaintiff can simply state "I did not intend to form a political committee" and, thus, she did not form one, is not in the plain language of the statute.  Rather, under the plain language of the statute, to become a political committee, *any* association or combination of persons must be organized, conducted, or combined for the purpose of influencing the results of the election.  The only intent requirement in the statute is that two or more people must intend to influence the results of an election.  In this case, Plaintiff did indeed write an email to several people with the intent that they would organize to influence the results of the Fountain Hills' bond election, and indeed, on November 6, 2011, two or more people, including Plaintiff, did organize to influence the results of the Fountain Hills' bond election.

The State argues that its' "intent" argument is supported by Arizona Revised Statutes section 16-902.01(A), which provided that "[e]ach political committee that intends to accept contributions or make expenditures of five hundred dollars or less shall file a signed exemption statement."  The State argues that the use of the word "intends" in that sentence "plainly contemplates that there must be a political committee that can form the requisite intent before § 16-902.01(A) could ever be implicated in this context." (Doc. 83 at 9).

There are two primary problems with this argument.  First, whether a political committee intends to accept contributions or expenditures does not revise the definition of political committee and, thus, cannot change who becomes a political committee.  Second, and perhaps more importantly, the intent element of section 16-902.01(A) is related only to whether a five hundred dollar exemption statement should be filed for a political committee spending less than five hundred dollars or whether a statement of organization should be filed for a political committee spending more than five hundred

dollars.  This point is emphasized by the fact that, even if a political committee does not *intend* to spend more than five hundred dollars, if it actually spends more than five hundred dollars, that committee must file a statement of organization within five business days after exceeding the five hundred dollar limit.   Ariz. Rev. Stat. §16-902.01(A) (2011).

As such, once a group of two or more people meet the definition of political committee, as Ms. Galassini and her fellow-protesters certainly do in this case, they are required to choose between filing a statement of organization or an exemption statement depending on how much money they anticipate spending or receiving.  Regardless of what choice they make, however, if they spend or receive contributions in excess of $500 (regardless of intent), they are required to file a statement of organization.  *Id.*  This is true notwithstanding whether they make such expenditures or receive such contributions individually or collectively and regardless of whether such expenditures are made or such contributions are received with the knowledge of the other people that are protesting.  As such, the word "intend" as used in section 16-902.01(A) does not support the State's argument that a group must "intend" to form a political committee before actually becoming one.  That argument is belied by the plain language of the statutes.

In support of its argument that the statute must require a "group intent" before a political committee is formed, the State reasons that it does not make sense for people protesting a bond measure together, who do not intend to form a group for any other purpose, to have to form some group intent as to how much money they intend to spend or receive.  The State's reasoning is not insignificant and ultimately highlights one of the problems with Arizona's statutory scheme as argued by Plaintiff.   However, that reasoning does not change the plain language of the statutes.

Based on the foregoing, because Plaintiff formed a political committee and intended to violate the challenged laws (and ultimately did violate them under the protection of the court's injunction), Plaintiff meets the factor of the standing analysis that requires Plaintiff to show with concrete detail that she intended to violate the

challenged law.   Moreover, as stated in the Court's Order granting Plaintiff's Motion for Preliminary Injunction, Plaintiff has shown a reasonable likelihood that the government would have enforced the challenged law against her.   Nothing in the Parties' summary judgment briefing changes the Court's analysis as to that factor.   Accordingly, Plaintiff has standing to challenge the pre-amendment statutory scheme.   The Ninth Circuit Court of Appeals' recent decision in *Libertarian Party of Los Angeles v. Bowen* lends support to this Court's prior analysis.   *See* 709 F.3d 867 (9th Cir. 2013).

### 2.   Mootness

The State of Arizona next argues that, even if Plaintiff had standing to challenge the pre-amendment version of the statutes, after the amendment to the statutes, Plaintiff's claims have become moot.   This argument is subject to particular scrutiny because the amendments occurred in response to this lawsuit.   *See Jacobus v. Alaska*, 338 F.3d 1095, 1102 (9th Cir. 2003) (a court's dismissal of a case on the ground of mootness is justified "only if it [is] absolutely clear that the litigant no longer ha[s] any need of the judicial protection that it [seeks]." ) (quoting *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 224 (2000)); *Coral Constr. Co. v. King County*, 941 F.2d 910, 928 (9th Cir. 1991) ("Even if the governmental entity is unlikely to reenact the provision, a case is not easily mooted where the government is otherwise unconstrained should it later desire to reenact the provision.").

> [I]f a challenged law is repealed or expires, the case becomes moot. However, we have also decreed that in cases involving the amendment or repeal of a statute, mootness is not a jurisdictional issue; rather, we may continue to exercise authority over a purportedly moot case where the balance of interests favors such continued authority. As we have explained, repeal of the objectionable language does not deprive the federal courts of jurisdiction to decide the constitutional question because of the well-settled principle that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.  These concerns are of particular force

> when the "voluntary cessation" occurred only in response to the district court's judgment. . . .
>
> Thus, although we have an independent obligation to decide whether we have jurisdiction over a case, mootness is not jurisdictional in cases such as this. Ordinarily, the party moving for dismissal on mootness grounds bears a heavy burden.

*Jacobus v. Alaska*, 338 F.3d 1095, 1102-1105 (9th Cir. 2003) (internal citations and quotations omitted). In this case, the statutory scheme to which Plaintiff objects was amended after this Court granted a motion for preliminary injunction enjoining the enforcement of the previous statutory scheme against Plaintiff. Moreover, the State of Arizona admitted at oral argument on the motions for summary judgment that the statutory scheme was amended in response to this lawsuit.

In her Amended Complaint, Plaintiff seeks declaratory and injunctive relief, nominal damages, and attorneys' fees. Plaintiff's claims for nominal damages and attorneys' fees based on the prior version of the statute are not moot. Nominal damages are available in actions where a violation of constitutional rights produces no actual damages. *See United States v. Marolf*, 173 F.3d 1213, 1219 (9th Cir.1999) (stating that nominal damages are available in § 1983 action where the violation of a legal or constitutional right produces no actual damages) (internal citation omitted); *Draper v. Coombs*, 792 F.2d 915, 921-22 (9th Cir. 1986) (permitting nominal damages in § 1983 action for violations of both statutory and constitutional rights). A claim for nominal damages creates the requisite personal interest necessary to maintain a claim's justiciability. *See Bernhardt v. County of Los Angeles*, 279 F.3d 862, 872 (9th Cir. 2002) ("A live claim for nominal damages will prevent dismissal for mootness.").

Based on the foregoing, Plaintiff's claims regarding the 2011 versions of the statutes are not moot as to nominal damages and attorneys' fees.

## B.    Post-Amendment Standing

The State of Arizona argues that, even if Plaintiff had pre-amendment standing,

- 26 -

due to the amendments to the statutory scheme, Plaintiff does not have standing to challenge the current statutory scheme.  The State of Arizona argues that the definition of political committee was amended to apply to "a candidate or any association or combination of persons that is organized, conducted or combined for the purpose of influencing the result of any election . . . that receives contributions or makes expenditures **of more than two hundred fifty dollars** in connection therewith,"[2] and that Plaintiff, who did not spend or raise two hundred and fifty dollars to conduct her protests, no longer has standing to challenge the statutory scheme. The State argues that, if, in the future, Plaintiff wants to send an email inviting people to join her in a protest and does not spend or raise more than two hundred fifty dollars, her actions would not qualify her as a political committee and thus, she does not have standing to challenge the 2012 version of the statutes.  (Doc. 83 at 7).

As discussed above, because the "chilling of the exercise of First Amendment rights is, itself, a constitutionally sufficient injury," "First Amendment challenges present unique standing considerations that tilt the inquiry dramatically toward a finding of standing."  *Bowen*, 709 F.3d at 870 (internal citations omitted).

Plaintiff argues that she has standing to challenge the amended statutory scheme because her speech continues to be chilled by it.  Plaintiff argues that the "recent minimal amendment to the scheme" has not solved the scheme's numerous constitutional problems and that, due to the overbreadth and complexity of the definitions of "contribution" and "expenditure," and the difficulty in ascertaining who is a "political committee" in the 183-word single sentence definition of political committee, Plaintiff

---

[2]   As discussed more fully below, the two hundred fifty dollar/five hundred dollar threshold requirements in the definition of political committee do not modify the phrase "any association or combination of persons that is organized, conducted or combined for the purpose of influencing the result of any election." Rather, reading the statute with the inclusion of the "clauses" that the State has left out of its definition through the use of ellipses make it impossible for the Court to read the statute as the State reads it.  These differing interpretations only support the Court's conclusion that Plaintiff maintains standing to challenge the amended version of the statutes.

1   has standing to challenge the statutory scheme in its current form.  Plaintiff is challenging

2   the statutory scheme: (1) as a violation of her First Amendment rights, (2) as overly

3   broad, (3) as vague, and (4) as a prior restraint.[3]

4          As noted above, in evaluating a First Amendment pre-enforcement facial

5   challenge to a statute, "courts examine three factors: (1) whether the plaintiffs have

6   articulated a 'concrete plan' to violate the law in question, (2) whether the prosecuting

7   authorities have communicated a specific warning or threat to initiate proceedings, and

8   (3) the history of past prosecution or enforcement under the challenged statute."  *Bowen*,

9   709 F.3d at 870 (internal quotation omitted).  Where the first two factors are met, the

10  final factor—history of past prosecution or enforcement— is not dispositive.  *Id.* at 872.

11         The evidence reveals that four or five people brought homemade signs to the

12  November protest, which constituted written messages on poster board.  (Doc. 85 at ¶ 48;

13  Doc. 90-1 at ¶ 48).  Ms. Galassini valued the amount the signs would have cost to be

14  between $12 to $20.  (Doc. 85 at ¶ 51; Doc. 90-1 at ¶ 51).  Ms. Galassini received no

15  contributions of money related to her planned protests.  (Doc. 85 at ¶ 52; Doc. 90-1 at ¶

16  52).  During her deposition, Plaintiff testified that she would be willing to spend more

17  than $250 as part of a group in her political activity related to future ballot issues if she

18  did not have to worry about Arizona's campaign finance laws being applied to her.  (Doc.

19  82-2 at ¶ 79).

20                      Because the Constitution requires something more

21  _____

22         [3]   Although Plaintiff characterizes her challenges to the statute as both facial and
    "as applied," Plaintiff does not appear to have an "as applied" challenge in this context.

23  As the Court recognized above, Plaintiff has sustained a constitutional injury because her

24  speech was chilled under the threat of the statute being applied to her.  As a result,
    Plaintiff has standing to challenge the statute before either: violating it and being subject

25  to any possible penalties as a result of that violation or choosing not to speak to avoid the
    risk of such penalties being applied to her.  Due to these First Amendment implications,

26  the Supreme Court has recognized that, under certain circumstances, plaintiffs have

27  standing to assert "pre-enforcement facial challenges."  However, because, in this case,
    the statutes have never been actually enforced against Plaintiff, the details of her "as

28  applied" challenge are unclear to the Court.

1
2
3
4
5
6

> than a hypothetical intent to violate the law, plaintiffs must articulate a concrete plan to violate the law in question by giving details about their future speech such as when, to whom, where, or under what circumstances.  The plaintiffs' allegations must be specific enough so that a court need not speculate as to the kinds of political activity the plaintiffs desire to engage in or as to the contents of their proposed public statements or the circumstances of their publication.

7

*Lopez*, 630 F.3d at 787 (internal quotations and citations omitted).

8
9
10
11
12
13
14
15
16
17
18
19
20

Here, Ms. Galassini is politically active and wants to be involved in rallies and protests where she cares about the issues at stake.  (Doc. 82-2 at ¶ 77).  Ms. Galassini argues that it is unclear whether she and her fellow protestors would run afoul of the amended statutory scheme because it is not clear when a group becomes a political committee or what qualifies as a contribution and/or expenditure under that scheme.  Ms. Galassini argues that she fears she can become a political committee within Arizona's statutory definition without intending to become a political committee based on possible expenditures or contributions received by her fellow protestors.  Ms. Galassini testified that she would get involved with and speak about future ballot issues and would associate with others to do so if she did not have to worry about Arizona's campaign finance laws being applied to her.  (Doc. 82-2 at ¶ 78).   Thus, Ms. Galassini has articulated a concrete plan to associate with others and engage in future protests like her protest of the November 8th bond election.

21
22
23
24
25
26

Ms. Galassini credibly asserts that she will refrain from such activities if there is a chance she will be penalized for unintentionally violating Arizona's campaign finance scheme.  "[W]here a plaintiff has refrained from engaging in expressive activity for fear of prosecution under the challenged statute, such self-censorship is a constitutionally sufficient injury as long as it is based on an actual and well-founded fear that the challenged statute will be enforced."  *Bowen*, 709 F.3d at 870 (internal citation omitted).

27
28

Ms. Galassini's attempts to comply with the law if she could understand it are well-supported in this case.  Immediately upon her receipt of the Town Clerk's letter explaining to her that she needed to register as a political action committee, Ms. Galassini

responded that she "had no idea [she] would be violating the law [and she would] stop all emails and not hold a rally."  Thereafter, rather than violate the law, Ms. Galassini brought this lawsuit challenging the law.  Based on her experience, Ms. Galassini has reason to believe that, should she ever hold a protest in the future and her fellow-protestors, either individually, or in combination, spend in excess of $250 unbeknownst to her, either because she does not know about the expenditures or because she does not understand what constitutes an "expenditure," the statute will be enforced against her.

Moreover, because the Town Clerk, after consultation with the Town Attorney, conveyed a threat to enforce the statutory scheme in its prior form against Ms. Galassini, there is every reason to believe that the same authorities will enforce the statutory scheme in its amended form.

Accordingly, the "new law is sufficiently similar to the repealed law" such that "the government's challenged conduct continues."  *See Chemical Producers and Distributors Ass'n v. Helliker*, 463 F.3d 871, 875 (9th Cir. 2006) (discussing test to be applied to determine if case seeking injunctive and declaratory relief has become moot when there is intervening legislation).  This is so because the "gravamen" of Plaintiff's complaint is that she is chilled from speaking by the overly broad and vague nature of Arizona's campaign finance scheme.  *See id.* at 875-76 (stating that "in evaluating whether the government's challenged conduct continues [for purposes of determining if the case is moot], the case or controversy giving rise to jurisdiction is the touchstone," and citing cases applying that principle).  Here, although the $250 threshold requirement may burden less speech than the $0 threshold, Plaintiff nonetheless credibly asserts that she is self-censoring based on an actual and well-founded fear that the challenged statutes will be enforced against her.  As a result, Ms. Galassini has standing to challenge the post-amendment version of Arizona's statutory scheme.

## C.    Plaintiff's Challenges to the Statutory Scheme

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech."  U.S. Const. amend. I.  Plaintiff challenges the definitions of

"political committee," "expenditure," and "contribution" as vague and overly broad and violative of her First Amendment rights.  Although there are various competing interests and rights and interests at issue in this case, it is necessary to begin with the definition of "Political Committee" and Plaintiff's argument that the definition is unconstitutionally vague.

### 1. Whether the Definition of "Political Committee" is Vague

Plaintiff argues that Arizona's definitions of "political committee," "expenditure," and "contribution" are vague because the 183-word definition of political committee requires extensive parsing and an understanding of the words "expenditure" and "contribution."  Pursuant to Arizona Revised Statutes section 16-901(19),

> "Political committee" means a candidate or any association or combination of persons that is organized, conducted or combined for the purpose of influencing the result of any election or to determine whether an individual will become a candidate for election in this state or in any county, city, town, district or precinct in this state, that engages in political activity in behalf of or against a candidate for election or retention or in support of or opposition to an initiative, referendum or recall or any other measure or proposition and that applies for a serial number and circulates petitions and, in the case of a candidate for public office except those exempt pursuant to § 16-903, that receives contributions or makes expenditures of more than two hundred fifty dollars in connection therewith, notwithstanding that the association or combination of persons may be part of a larger association, combination of persons or sponsoring organization not primarily organized, conducted or combined for the purpose of influencing the result of any election in this state or in any county, city, town or precinct in this state. Political committee includes the following types of committees:
>
> (a) A candidate's campaign committee.
>
> (b) A separate, segregated fund established by a corporation or labor organization pursuant to § 16-920, subsection A, paragraph 3.

(c) A committee acting in support of or opposition to the qualification, passage or defeat of a ballot measure, question or proposition.

(d) A committee organized to circulate or oppose a recall petition or to influence the result of a recall election.

(e) A political party.

(f) A committee organized for the purpose of making independent expenditures.

(g) A committee organized in support of or opposition to one or more candidates.

(h) A political organization.

(i) An exploratory committee.

Attempting to determine which "clauses" in the 183-word single sentence definition of political committee are dependent, independent, restrictive, or non-restrictive is difficult to say the least.

Throughout its briefing, the State of Arizona contends that the definition of "political committee" is "a candidate or any association or combination of persons that is organized, conducted or combined for the purpose of influencing the result of any election . . . that receives contributions or makes expenditures of more than two hundred fifty dollars in connection therewith."  At oral argument, the State seemed to propose a construction of the statute that would insert the word *and* after "in the case of a candidate for public office except those exempt pursuant to § 16-903," so that the State could argue that the clause "that receives contributions or makes expenditures of more than two hundred fifty dollars" would apply to three distinct types of "committees:" (1) those organized for the purpose of influencing the result of any election; (2) those organized to determine whether an individual will become a candidate for election in this state or in any county, city, town, district or precinct in this state; and (3) candidates for public office except those exempt pursuant to § 16-903.  However, this proposed construction is

- 32 -

not supported by the plain language of the statute because it requires an addition of the conjunction "and" and it renders the phrase "in the case of" superfluous.  As a result, the Court cannot find that the State's reading of the statute is supported by the plain language of the statute.

The Court has attempted to diagram this statute several different times.  In none of the Court's diagrams does the phrase "that receives contributions or makes expenditures of more than two hundred fifty dollars in connection therewith" modify "any association or combination of persons that is organized, conducted or combined for the purpose of influencing the result of any election."  The Court can find no purpose for the phrase "in the case of a candidate for public office except those exempt pursuant to § 16-903," unless the phrase "that receives contributions or makes expenditures of more than two hundred fifty dollars in connection therewith" was intended to modify it and only it.

> The First Amendment does not permit laws that force speakers to retain a campaign finance attorney, conduct demographic marketing research, or seek declaratory rulings before discussing the most salient political issues of our day.  Prolix laws chill speech for the same reason that vague laws chill speech: People of common intelligence must necessarily guess at the law's meaning and differ as to its application.  The Government may not render a ban on political speech constitutional by carving out a limited exemption through an amorphous regulatory interpretation.

*Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 324 (2010) (internal quotation and citation omitted).

In this case, it is not clear that even a campaign finance attorney would be able to ascertain how to interpret the definition of "political committee."  As such, people of common intelligence must guess at the law's meaning and will differ as to its application.  Such vagueness is not permitted by the Constitution.  However, the Court need not rest its holding solely on the vagueness of the definition of political committee.  Indeed, even if the Court were to accept the State's proffered interpretation of the definition of political

committee, the definition is overbroad because it sweeps in a substantial amount of constitutionally protected speech without any sufficiently important governmental interest in regulating such speech.

### 2.     The First Amendment

> When deciding whether a state election law violates First and Fourteenth Amendment associational rights, we weigh the "'character and magnitude'" of the burden the State's rule imposes on those rights against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary. *Burdick*, *supra*, at 434, 112 S.Ct., at 2063–2064 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789, 103 S.Ct. 1564, 1570, 75 L.Ed.2d 547 (1983)). Regulations imposing severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling state interest. Lesser burdens, however, trigger less exacting review, and a State's "'important regulatory interests'" will usually be enough to justify "'reasonable, nondiscriminatory restrictions.'" *Burdick*, *supra*, at 434, 112 S.Ct., at 2063 (quoting *Anderson*, *supra*, at 788, 103 S.Ct., at 1569–1570); *Norman*, *supra*, at 288–289, 112 S.Ct., at 704– 706 (requiring "corresponding interest sufficiently weighty to justify the limitation"). No bright line separates permissible election-related regulation from unconstitutional infringements on First Amendment freedoms. *Storer*, *supra*, at 730, 94 S.Ct., at 1279 ("[N]o litmus-paper test . . . separat[es] those restrictions that are valid from those that are invidious. . . .The rule is not self-executing and is no substitute for the hard judgments that must be made").

*Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358-359 (1997).

Plaintiff acknowledges that the Ninth Circuit Court of Appeals applied exacting scrutiny to reporting requirements in *Canyon Ferry Road Baptist Church of East Helena, Inc. v. Unsworth*, 556 F.3d 1021 (9th Cir. 2009), but argues that the Court should apply strict scrutiny "for the reasons highlighted by the" Eighth Circuit Court of Appeals in *Minnesota Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 874-75 (8th Cir. 2012).  In *Swanson*, the Eighth Circuit Court of Appeals questioned whether exacting scrutiny is the appropriate test simply because a law is characterized as a "disclosure

law."  The Eighth Circuit Court of Appeals reasoned,

> Generally, "[l]aws that burden political speech are 'subject to strict scrutiny,' which requires the [g]overnment to prove that the restriction 'furthers a compelling interest and is narrowly tailored to achieve that interest.'" *Citizens United*, 558 U.S. at ――, 130 S.Ct. at 898 (quoting *FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 464, 127 S.Ct. 2652, 168 L.Ed.2d 329 (2007) (opinion of Roberts, C.J.)). But this is not true when the law at issue is a disclosure law, in which case it is subject to "'exacting scrutiny,' which requires a 'substantial relation' between the disclosure requirement and a 'sufficiently important' governmental interest." *Id.* at ――, 130 S.Ct. at 914 (quoting *Buckley*, 424 U.S. at 64, 66, 96 S.Ct. 612); *accord Doe v. Reed*, 561 U.S. ――, ――, 130 S.Ct. 2811, 2818, 177 L.Ed.2d 493 (2010).
>
> The district court characterized the challenged provisions as a disclosure law and accordingly determined exacting scrutiny was appropriate. We question whether the Supreme Court intended exacting scrutiny to apply to laws such as this, which subject associations that engage in minimal speech to "the full panoply of regulations that accompany status as a [PAC]." . . . *MCFL*, 479 U.S. at 262, 107 S.Ct. 616. Allowing states to sidestep strict scrutiny by simply placing a "disclosure" label on laws imposing the substantial and ongoing burdens typically reserved for PACs risks transforming First Amendment jurisprudence into a legislative labeling exercise.

*Swanson*, 692 F.3d at 874-75.  Despite its concerns, the Eight Circuit Court of Appeals ultimately applied exacting scrutiny to the laws in question.  The Court will likewise apply exacting scrutiny in this case.

Exacting scrutiny requires a substantial relation between the disclosure requirement and a sufficiently important governmental interest.  *Doe v. Reed*, __ U.S. ___, 130 S.Ct. 2811, 2818 (2010) (internal quotation and citation omitted).  "To withstand this scrutiny, the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights."  *Id.* (internal quotation and citation omitted).

### a.    The State's Interest

The State of Arizona first argues that "Arizona's campaign finance disclosure laws do protect legitimate state interests at rooting out improper attempts to evade constitutional disclosure and disclaimer requirements while ensuring that no significant burden falls on small campaigns that spend money in ballot measure elections." (Doc. 93 at 4). To support this argument, the State argues that "Arizona's laws specifically exempt individual speakers who do not *intend* to form committees or accept contributions." (Doc. 93 at 4). As discussed more fully above, Arizona's laws do not exempt speakers on the basis of those speakers' intent to form a political committee. As such, the laws do not strike the balance alluded to by the State of "rooting out improper attempts to evade constitutional disclosure and disclaimer requirements while ensuring that no significant burden falls on small campaigns that spend money in ballot measure elections."

The State next argues that it nonetheless has an "important interest in regulating smaller-scale speakers." (Doc. 93 at 8). The State's argument that is has an important interest in regulating small groups like Ms. Galassini's is somewhat undermined by the fact that the State simultaneously denies any intent to regulate such small groups. The State argues that various courts have recognized that the State has an important interest in ensuring that voters know the source of messages promoting or opposing ballot measures. The State further argues that the $250 threshold requirement "provides an important check on large political committees' power to circumvent disclosure requirements by seeding many smaller committees with sufficient funds to make a real impact on small local elections and ballot measures." (Doc. 93 at 10). The State further argues that "Plaintiff herself provides a data point in favor of the $250 zero-reporting threshold, as she was able to defeat the Fountain Hills bond by sending out a few emails and asking for no more than her acquaintances to come stand outside with signs." (Doc. 93 at 10). The State argues that, even if the disclosure requirements were applied to Plaintiff and her group, "voters have a right to know who is trying to influence their votes," and that is an important enough interest to require such disclosure.

1    First, it is not clear how the $250 threshold requirement targets large political

2    committees' attempts to avoid disclosure requirements by seeding smaller committees.

3    The language of the statute could address this concern with language that actually

4    furthered this offered purpose regardless of the $250 threshold.  Moreover, the statute

5    does not require that two or more people have a joint intent or agreement to make

6    expenditures or accept contributions.

7        As a result, under Arizona's statutory scheme, an individual could be subject to

8    penalties if he makes expenditures for the purpose of influencing the results of an election

9    and then, weeks or months later, attends a rally to advocate his position as to that same

10   election.  Although the other attendees of the rally are unaware of that individual's

11   expenditures, they have unwittingly become members of that individual's political

12   committee.  Likewise, the individual, who made the expenditures as an individual, and

13   then attended a rally with other like-minded individuals, has ipso facto created a political

14   committee.[4]

15       Second, the State repeatedly argues that voters have a right to know who is trying

16   _____

17       [4]  In arguing that the statute requires an "intent to form a political committee," the

18   State argues that:

19           Surely, it would come as a surprise to a person who
             read the statute if, as Plaintiff has it, that person individually

20           could be deemed a political committee when that person is
             not a candidate. Second, it would surely come as a surprise to

21           the person that she has "organized, conducted or combined"
             herself *solely* by showing up at a rally at someone else's

22           suggestion. Third, it would surely come as a surprise to a

23           group of people that they had collectively formed "inten[t] to
             accept contributions or make expenditures" when in fact they

24           have never previously met.

25

26   (Doc. 96 at 5).  Accordingly, the State itself acknowledges that, without the element of

27   "intent to form a political committee," the statutory scheme has serious problems.  As the
     Court discussed above, there is no "intent to form a political committee" in the statute

28   itself, and even if there were, it is not clear whether that particular intent requirement
     would correct the deficiencies in the definition of political committee.

to influence their votes and that this is an important informational interest.  The State does not explain why such disclosure is required of two people when it is not required of one person who does the speaking.  But, assuming that the State has an interest in informing the public of the identity of two or more people attempting to influence an election, this interest must be balanced in relation to the burden on First Amendment rights, and as such, the State's scheme must be substantially related to its important interest.

### b.    Substantial Relation

First Amendment standards "must give the benefit of any doubt to protecting rather than stifling speech."  *Citizens United*, 558 U.S. at 327 (internal citation omitted). There is no question that, if two or more people want to speak to influence the result of an election, their speech is chilled by the regulations imposed by Arizona's campaign finance laws.  *See Citizens United*, 558 U.S. at 334 ("As additional rules are created for regulating political speech, any speech arguably within their reach is chilled.").  "What is permissible within [the outer limits of political committee regulation] depends on whether the burdens imposed by the disclosure requirements are substantially related to the government's important informational interest."  *Human Life of Washington, Inc. v. Brumsickle*, 624 F.3d 990, 1010 (9th Cir. 2010).

The State offers no explanation as to how its disclosure interest is substantially related to its requirement that an exemption statement be filed *before* speech takes place. Likewise, the State offers no explanation as to how the regulations imposed on groups of two or more people making expenditures or receiving contributions of less than $500 are substantially related to its disclosure interest.   Rather, under Arizona's statutory scheme, when two or more people organize, combine or are conducted for the purpose of influencing the results of the election and, either individually or in combination, receive contributions or make expenditures in excess of $250, but below $500 they must:

> (1) file a signed exemption statement *before* making any expenditures, accepting any contributions, or distributing any campaign literature, Ariz.

Rev. Stat. Ann. § 16-902.01,

(2) designate a chairman and treasurer, who are not the same individual, Ariz. Rev. Stat. Ann. § 16-902(A),

(3) before accepting a contribution or making an expenditure, must open a bank account, Ariz. Rev. Stat. Ann. § 16-902(C),

(4) maintain a record of all contributions received and expenditures made by the committee, Ariz. Rev. Stat. Ann. § 16-904(F)(1),

(5) file a termination statement within ninety days after the end of the election cycle, Ariz. Rev. Stat. Ann. § 16-904(F)(2),(3), and

(6) include "paid for by" on all literature or advertisements, Ariz. Rev. Stat. Ann. § 16-912.01.

It is difficult to believe that any person that received Ms. Galassini's email and attended the November protest of the bond election would know that, by attending, they were becoming a member of a "political committee," and were, thus, subject to the regulations and penalties governing the conduct of political committees. Once realizing that they would become a member of a political committee by attending the rally, there is little doubt that such person would decide it safer to remain silent than to risk the penalties of a complex regulatory scheme. Such chilling effect is only exacerbated by the fact that, when more than one person attends a rally without knowledge of the other attendees' expenditures, the attendees in combination could become an ad hoc political committee based on their individual expenditures.[5]

---

[5] Indeed, under this statutory scheme, two people that have never met before could go to a street corner with signs that protest a bond measure in the next election. Those two people could meet on the street corner, realize that they are protesting the same election and make an agreement that one will face north on the street and one will face south. Although neither is aware of the fact, one of the people has spent $245 dollars on his sign and the other has spent $20 on his sign. The two people have organized to influence the results of an election and made expenditures of more than $250 and have, thus, become a political committee unbeknownst to either of them. Further, they have already violated Arizona's campaign finance scheme because they have not registered as a political committee *before* organizing to influence the results of an election.

1          Such a chilling effect might be lessened, as the State suggests, if the scheme solely
2   required the filing of an exemption statement disclosing the identity of the speakers
3   protesting the election *prior to the election*.  Such requirement might even satisfy the
4   State's important interest of keeping the voter's informed of who is trying to influence
5   them in an election.  The Court need not decide that issue in this case, however, because
6   the statutory scheme requires much more than the simple disclosure of the identity of the
7   group's speakers prior to an election.  Rather, as detailed above, the scheme requires
8   more than simply filing a disclosure statement for groups spending under $500.  Such a
9   scheme chills the speech of two or more people wishing to speak on the subject of an
10  upcoming election because, to guarantee that they will not run afoul of Arizona's
11  campaign finance laws, they must file an exemption statement before they speak, open a
12  bank account, and designate a chairman and treasurer, among other things.   The
13  "administrative costs of complying with such increased responsibility may create
14  disincentive for the [group] to speak."  *Federal Election Comm'n v. Massachusetts*
15  *Citizens for Life, Inc.*, 479 U.S. 238, 254-255 n. 7 (1986) (plurality opinion) ("*MCFL*")
16  ("Detailed recordkeeping and disclosure obligations, along with the duty to appoint a
17  treasurer and custodian of records, impose administrative costs that many small entities
18  may be unable to bear . . . . Furthermore, such duties require a far more complex and
19  formalized organization than many small groups could manage.").

20          The requirements imposed on small groups are not substantially related to the
21  State's proffered interest in the disclosure of the identity of anyone trying to influence
22  voters.  The State argues that the Ninth Circuit Court of Appeals decision in *Brumsickle*
23  supports its position that imposing a disclosure requirement is substantially related to the
24  State's important interest.  However, *Brumsickle* is distinguishable from this case because
25  the *Brumsickle* court noted that the disclosure law in that case was tailored to reach only
26  those groups with a primary purpose of political activity, which "limitation ensures that
27  the electorate has information about groups that make political advocacy a priority,
28  without sweeping into its purview groups that only incidentally engage in such

advocacy." 624 F.3d at 1011.   In this case, Arizona's definition of political committee does sweep into its purview groups that only incidentally engage in political advocacy. The State does not explain how its disclosure interest is furthered by rendering two or more people seeking to influence the results of an election an ad hoc political committee.

Under this statutory scheme, any time two or more people want to engage in core political speech to influence the results of an election, they will be chilled from doing so because Arizona's definition of political committee is vague and because the regulations imposed on small groups that seek to combine to influence the results of an election are not substantially related to the State's disclosure interest. *See MCFL*, 479 U.S. at 255 ("Faced with the need to assume a more sophisticated organizational form, to adopt specific accounting procedures, to file periodic detailed reports, to monitor garage sales lest nonmembers take a fancy to the merchandise on display, it would not be surprising if at least some groups decided that contemplated political activity was simply not worth it.").   The practical effect of such regulations for small groups makes engaging in protected speech a "severely demanding task." *Id.* at 256.

A statute will be invalidated as "overbroad," violating the First Amendment, if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460 (2010) (internal quotation marks omitted).   The definition of political committee in Arizona Revised Statutes section 16-901(19) is overbroad because it sweeps in a substantial amount of protected speech that the State does not have an important interest in regulating.[6]

### D.     The Town of Fountain Hills' Motion for Summary Judgment

Defendant Town of Fountain Hills argues that it is entitled to summary judgment

---

[6] In light of the Court's holding that the definition of political committee is unconstitutionally overbroad and vague, the Court need not address Plaintiff's additional arguments that the definitions of expenditures and contributions render the definition of political committee vague or that the requirement of filing an exemption statement prior to speaking is a prior restraint on speech.

because it is not a proper defendant in this case.  Specifically, the Town of Fountain Hills argues that Plaintiff's claims for declaratory and injunctive relief relate solely to the constitutionality of the statutes and, because the State has intervened to defend the constitutionality of those statues, there is no declaratory and injunctive relief that Plaintiff can obtain against the Town.

The Town further argues that, although Plaintiff alleges that the Town was acting pursuant to a custom or policy when the Town Clerk wrote Plaintiff the October 12, 2011 letter, "Plaintiff has neither offered nor proven that the Town or its officials have enacted a local policy or approved a local custom regarding compliance with State campaign finance laws or the registration of political committees."  (Doc. 84 at 4).  As a result, the Town argues that Plaintiff is not entitled to an award of nominal damages or attorneys' fees against the Town.  (*Id.*).

In Response, Plaintiff argues that the Town's policy is to apply the State's statutes without regard to their constitutionality.  Plaintiff argues that she has demonstrated that the Town has such a policy by providing evidence that the Town Clerk consulted with the Town Attorney before writing Plaintiff a letter that ultimately chilled her speech. Plaintiff argues that, pursuant to Arizona Revised Statutes section 16-924(A),[7] it is the

---

[7] Arizona Revised Statutes section 16-924(A) provides,

> Unless another penalty is specifically prescribed in this title, if the filing officer for campaign finance reports designated pursuant to § 16-916, subsection A has reasonable cause to believe that a person is violating any provision of this title, except for violations of chapter 6, article 2, . . .  the secretary of state shall notify the attorney general for a violation regarding a statewide office or the legislature, the county officer in charge of elections shall notify the county attorney for that county for a violation regarding a county office or the city or town clerk shall notify the city or town attorney for a violation regarding a city or town office. The attorney general, county attorney or city or town attorney, as appropriate, may serve on the person an order requiring compliance with that provision. The order shall state with

Town Clerk's duty to notify the Town Attorney about town election campaign finance law violations and it is the Town Attorney's duty to enforce those decisions.

"[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell v. Dep't of Social Services*, 436 U.S. 658, 694 (1978). Moreover,

> a municipality can be liable for an isolated constitutional violation when the person causing the violation has "final policymaking authority." *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 123, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (plurality) ("[O]nly those municipal officials who have 'final policymaking authority' may by their actions subject the government to § 1983 liability."); *Gillette*, 979 F.2d at 1347 ("[T]he Supreme Court held that a single decision by a municipal policymaker may be sufficient to trigger section 1983 liability under *Monell*, even though the decision is not intended to govern future situations.").

*Christie v. Iopa*, 176 F.3d 1231, 1235-1236 (9th Cir. 1999).

Plaintiff argues that the evidence in this case shows that it is the policy of the Town Attorney and Town Clerk, the policymakers in the context of enforcement of the statutory scheme, to enforce State statutes regardless of their constitutionality. To support her argument, Plaintiff points to the deposition testimony of the Town Clerk, wherein she testified that there was a meeting between her, the Town Attorney, and the Town Clerk where they met and determined whether to send the letter to Plaintiff. (Doc. 82-2 at ¶¶ 18-19). Plaintiff likewise argues that the following testimony of the Town

---

> reasonable particularity the nature of the violation and shall require compliance within twenty days from the date of issuance of the order. The alleged violator has twenty days from the date of issuance of the order to request a hearing pursuant to title 41, chapter 6.

Ariz. Rev. Stat. Ann. § 16-924(A).

Clerk supports her argument that the Town's policymakers have a policy of enforcing statutes regardless of their constitutionality:

> Q.      Okay.      Does the town have any policies on enforcement of state campaign finance statutes?
> A.      Just by statute.
> Q.      What do you mean, "by statute"?
> A.      Well, there's procedures in the state statute that, you know, if certain things aren't done, these are things that you can do or may do.
> Q.      Okay.  So you abide by the state statute?
> A.      We abide by state statute, yes.
> Q.      Do you always enforce the Arizona campaign finance laws in Fountain Hills elections?
> A.      With the help of the attorney.
>         . . .
> Q.      When you enforce the Arizona campaign finance laws, you enforce them as written?  You don't care what the substance of the law is, you just enforce them because you are supposed to.  Is that correct or am I misunderstanding that?
> A.      I believe that's true.
> Q.      Okay.   What if you think that the state law is unconstitutional, do you enforce it then?  Do you have to enforce it?
> A.      I go by state law.

(Doc. 91-2 at 27-28; Doc. 91-1 at ¶ 19).

In reply, the Town argues that the Town Attorney "took no action" in this case and the Town Clerk has no enforcement authority.  The Town argues that, because Plaintiff received "nothing more than a letter from the Clerk, the Plaintiff really has no ripe or justiciable cause of action.  If she did her remedy was one in State law, as set forth in A.R.S. § 16-924(A)(B)(C)."  (Doc. 97).  The Court disagrees.  As discussed above, the Town Clerk's letter to Plaintiff chilled Plaintiff's speech, causing her to self-censor, which is a constitutional harm giving Plaintiff standing to assert her claims in this case.  As a result, Plaintiff was not required to "exhaust her administrative remedies," as argued by the Town.[8]

---

[8] Even if Plaintiff were required to exhaust her administrative remedies, the Town

1      The Town next argues that Plaintiff has failed to show the existence of any policy.
2   The Town argues that, assuming a claim can be maintained against a municipality where
3   a municipality's policymakers have made a conscious decision to enforce state law,
4   Plaintiff has failed to provide evidence of a conscious decision or an enforcement of state
5   law.  (Doc. 97 at 5 (internal citation omitted)).

6      Although the Town repeatedly asserts that it did not enforce the statutory scheme
7   against Plaintiff, as discussed above, the Town threatened Plaintiff with enforcement of
8   the statutory scheme, which caused her to sustain a constitutional injury.  Although this is
9   certainly a unique situation, where a constitutional injury has been sustained as a result of
10  the actions of the policymaker, whether the statutes have indeed been enforced is
11  irrelevant.

12     The Town argues that the Clerk is the person who wrote the letter, but the Clerk is
13  not a policymaker.  The Town argues that only the Town Attorney is a policymaker and
14  he never wrote such a letter.  There is a disputed issue of material fact as to whether the
15  Town indeed has a policy of applying or threatening to apply statutes regardless of their
16  constitutionality.  In this case, Mr. Mood, who helped put the bond package together,
17  received Ms. Galassini's email.  Mr. Mood then forwarded the email to the Town
18  Manager of Fountain Hills.  After the Town Clerk received the same email from Mr.
19  Mood's office, the Town Manager and the Town Clerk consulted with the Town
20  Attorney.  During that meeting, the Town Manager, the Town Clerk, and the Town
21  Attorney decided to send Ms. Galassini the October 12, 2011 letter.  Accordingly, after
22  receiving Ms. Galassini's email from Mr. Mood (a person who obviously had an opposite
23  viewpoint on the bond issue), the Town Clerk, Town Attorney and Town Manager
24  decided to send Ms. Galassini a letter.  That letter chilled the exercise of Ms. Galassini's

25

26  has waived this argument.  The Town first raised this argument in its reply in support of
27  its motion for summary judgment, depriving Plaintiff of the opportunity to respond.
    Arguments raised for the first time in a reply brief are waived, *Graves v. Arpaio*, 623
28  F.3d 1043, 1048 (9th Cir. 2010), and exhaustion is an affirmative defense that may be
    waived if not raised.  *See, e.g.*, *Jones v. Bock*, 549 U.S. 1999, 212 (2007).

speech in opposition to the bond proposal, a constitutionally recognized injury. This decision by the Town Clerk, Town Attorney, and Town Manager was a conscious decision, which resulted in a constitutional injury to Ms. Galassini.

Moreover, in her deposition, the Town Clerk stated that the Town enforces such statutes as written without an evaluation of their constitutionality. Although the Town argues that the Town Clerk does not make decisions about a statute's constitutionality and Plaintiff has failed to show that the Town Attorney does not evaluate a statute's constitutionality before enforcing it, the Town Clerk's testimony is enough to raise a genuine issue of material fact as to whether the Town has a policy of enforcing state statutes, regardless of their constitutionality.

The Town does not appear to dispute the proposition that a policy can be premised on the failure to analyze the constitutionality of statutes before enforcing them. Indeed, the case law cited by Plaintiff supports this conclusion.

In *Cooper v. Dillon*, the Eleventh Circuit Court of Appeals held that a policy maker's decision to enforce a statute, which resulted in a deprivation of Plaintiff's constitutional rights, triggered municipal liability. 403 F.3d 1208, 1223 (11th Cir. 2005). The Eleventh Circuit Court of Appeals reasoned that:

> While the unconstitutional statute authorized [the policymaker] to act, it was his deliberate decision to enforce the statute that ultimately deprived [Plaintiff] of constitutional rights and therefore triggered municipal liability. Thus, [the policymaker's] decision to enforce an unconstitutional statute against Cooper constituted a "deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy." Accordingly, we find that the [municipality], through the actions of [its policymaker], adopted a policy that caused the deprivation of [Plaintiff's] constitutional rights which rendered the municipality liable under § 1983.

*Id.* (internal citations omitted) (ellipses in original).

Similarly, in a case where a state statute granted a municipality's officers discretion in declaring a road public, the Ninth Circuit Court of Appeals reasoned that

*Monell* liability could be found as to the municipality regardless of whether the officers were applying the statute in good faith because:

> The knowledge that a municipality will be liable for all of its injurious conduct, whether committed in good faith or not, should create an incentive for officials who may harbor doubts about the lawfulness of their intended actions to err on the side of protecting citizens' constitutional rights. Furthermore, the threat that damages might be levied against the city might encourage those in a policymaking position to institute internal rules and programs designed to minimize the likelihood of unintentional infringements on constitutional rights.

*Evers v. Custer County*, 745 F.2d 1196, 1204 (9th Cir. 1984) (quoting *Owen v. City of Independence*, 445 U.S. 622, 650-52 (1979)).

Accordingly, if a policymaker deprives a person of their constitutional rights as a result of the application of a state statute, without regard to the application's constitutionality, the municipality could be subject to *Monell* liability because "a municipality will be liable for all of its injurious conduct, whether committed in good faith or not." *Id.* at 1204. Based on the foregoing, there is a disputed issue of material fact as to whether the Town has a policy of applying state statutes regardless of their constitutionality.

Therefore, the Town's Motion for Summary Judgment is denied. Likewise, Plaintiff's Motion for Summary Judgment is denied as to her *Monell* claim against the Town.

### E.    Relief Sought

#### 1.    The Eleventh Amendment

In a footnote, in Response to the Town's Motion for Summary Judgment, Plaintiff argued that, even if the Town was ultimately dismissed from this case, Plaintiff would still be entitled to relief against the State because the State has waived Eleventh Amendment immunity. (Doc. 91 at 8). Plaintiff relies on *Lapides v. Bd. of Regents*, 535 U.S. 613, 619 (2002) to support her argument. In apparent response to this argument, the

State, in its Response to Plaintiff's Motion for Summary Judgment (Doc. 90), raises the issue of Eleventh Amendment immunity for the first time.  The State specifically argues,

> Plaintiff's assertion that she retains a claim against the State notwithstanding the Town's position is apparently based on a misreading of *Lapides v. Board of Regents*, 535 U.S. 613 (2002). See Doc. 91 at n.8. There, the State waived 11th Amendment immunity by affirmatively invoking federal court jurisdiction in order to avoid state court jurisdiction. *Lapides*, 535 U.S. at 620. It does not follow that the Plaintiff has a claim against the State because the State intervened, and, indeed, the State has insisted throughout the case that jurisdiction over this matter is inappropriate.

(Doc. 96 at 11 n. 9).

Notably, the State provides no legal or factual citation for its statement that "[i]t does not follow that the Plaintiff has a claim against the State because the State intervened, and indeed, the State has insisted throughout the case that jurisdiction over this matter is inappropriate."

Indeed, contrary to the State's contention that *Lapides* provides no support for Plaintiff's argument, *Lapides* specifically states,

> Thus, it is not surprising that more than a century ago this Court indicated that a State's voluntary appearance in federal court amounted to a waiver of its Eleventh Amendment immunity. *Clark v. Barnard*, 108 U.S. 436, 447, 2 S.Ct. 878, 27 L.Ed. 780 (1883) (State's "voluntary appearance" in federal court as an intervenor avoids Eleventh Amendment inquiry).

*Lapides*, 535 U.S. at 619 (citation in original); *see also Embury v. King*, 361 F.3d 562, 564 (9th Cir. 2004) (concluding that "the rule in *Lapides* applies to federal claims as well as to state law claims.").  Moreover, contrary to the State's contention that it has "insisted throughout the case that jurisdiction over this matter is inappropriate," this statement is not true in the context of Eleventh Amendment immunity.  The State did not mention Eleventh Amendment immunity in its Motion to Intervene (Doc. 13) or in its Answer to

1    Plaintiff's Original Complaint (Doc. 40), or in its Answer to Plaintiff's Amended

2    Complaint (Doc. 66).  The State cannot contend that its general jurisdictional challenges

3    to Plaintiff's standing, ripeness, and mootness are equivalent to an assertion of Eleventh

4    Amendment immunity.  Indeed, it appears that the first and only time that the State raised

5    the issue of Eleventh Amendment immunity was in a footnote in response to Plaintiff's

6    Motion for Summary Judgment as quoted above.

7        Eleventh Amendment immunity is an affirmative defense.  *Hill v. Blind Indus. &*

8    *Servs. of Md.*, 179 F.3d 754, 760 (9th Cir. 1999) (citing *In ITSI TV Prods.*, *Inc. v.*

9    *Agricultural Ass'ns*, 3 F.3d 1289 (9th Cir. 1993)).

> [L]ike every other defendant, a state must timely object to the
> forum or be deemed to have waived its objections.  The
> Eleventh Amendment was never intended to allow a state to
> appear in federal court and actively litigate the case on the
> merits, and only later belatedly assert its immunity from suit
> in order to avoid an adverse result.

*Id*. at 763.

15       As a result, even if the State were not bound by the Supreme Court's holding in

16   *Clark* that appearance as an intervenor waives a State's Eleventh Amendment immunity,

17   the Court would nonetheless find that the State waived its Eleventh Amendment

18   immunity in this case.  This is so because the State has fully litigated this case on the

19   merits with no mention of Eleventh Amendment immunity until its response to Plaintiff's

20   Motion for Summary Judgment.  This is a belated assertion to immunity from suit in

21   order to avoid an adverse result and, as such, constitutes a waiver.

### 2.    Nominal Damages and Attorneys' Fees

23       Plaintiff claims that "nominal damages and attorneys' fees [pursuant to 42 U.S.C.

24   § 1988] should be awarded against the Town and State jointly and severally because it

25   was the Town's decision to apply the State's unconstitutional statute that served as the

26   catalyst for this case—both entities are responsible for the violation of Ms. Galassini's

27   rights and both should bear the consequences."  (Doc. 101 at 2-3).  Although Plaintiff

28   contends that she is entitled to these attorneys' fees and nominal damages pursuant to 42

U.S.C. § 1988, which allows for attorneys' fees incurred as a result of an action to enforce a provision of 42 U.S.C. § 1983, Plaintiff does not explain how the State is liable for attorneys' fees and nominal damages based on Plaintiff's claims.  The state is not a "person" for purposes of a damage suit under § 1983.  *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 65-66 (1989).  As a result, the State is not liable for nominal damages or attorneys' fees.  If, at trial, Plaintiff succeeds on her *Monell* claim against the Town, she will be entitled to an award of nominal damages and attorneys' fees against the Town.

### 3.        Injunctive and Declaratory Relief

Plaintiff is entitled to a declaration that the definition of "political committee" in Arizona Revised Statutes section 16-901(19) is unconstitutionally vague and overbroad.

With regard to injunctive relief based on Plaintiff's *Monell* claim against the Town, if a jury finds the Town was acting pursuant to an unconstitutional policy, injunctive relief may be appropriate on that claim.

However, injunctive relief to prevent enforcement of Arizona Revised Statutes section 16-901(19) is another matter.  Pursuant to *Ex parte Young*, 209 U.S. 123, 155–56 (1908), to obtain an injunction based on enforcement of a statute, Plaintiff must sue an official who has some connection with the enforcement of the act.  *Id.* at 157.  In this case, Plaintiff admits that "it is only the Town Clerk and Town Attorney that have enforcement authority."  (Doc. 91 at 7).  However, although Plaintiff originally named the Town Clerk and Town Attorney as Defendants in this lawsuit, Plaintiff later stipulated to the dismissal of both the Town Clerk and Town Attorney.  (Doc. 61 and Doc. 62).  The Stipulation states that "[i]f there is any ambiguity or need to interpret the language of the dismissal, it is the intent of the Parties that the dismissal granted by this stipulation and Order essentially put the dismissed parties and Plaintiff back in the position they would have been in if the Town Attorney and Town Clerk had never been joined as defendants in this action."  (Doc. 61 at 2-3).

Plaintiff makes no direct argument that the State and Town are entities which

themselves have enforcement authority of the statutes.  Accordingly, it is not clear that injunctive relief against those entities is appropriate.  Nonetheless, because the State and Town are ultimately the employers of those that have enforcement authority, if a State has waived its Eleventh Amendment immunity, an injunction is appropriate.  *See Thalheimer v. City of San Diego*, 645 F.3d 1109, 1129 (9th Cir. 2011) (affirming district court's order enjoining the City of San Diego from enforcing statutes).

As a result, injunctive relief is appropriate in this case.    In her Amended Complaint, Plaintiff seeks "entry of a . . . permanent injunction against Defendants prohibiting the enforcement of these regulations, laws, rules, and policies." (Doc. 65 at 23).  Likewise, in her Motion for Summary Judgment, Plaintiff requests "that this Court find Arizona's definitions of political committee, contribution, and expenditure unconstitutionally vague." (Doc. 82-1).  However, at oral argument, Plaintiff repeatedly asserted that she only seeks an injunction "as applied" to small groups like Ms. Galassini's group.

The Court cannot grant Plaintiff the injunction she seeks for two reasons.  First, although Plaintiff continues to assert that the statutory scheme has been applied to her and she has an "as-applied challenge," entitling her to as-applied relief, as discussed more fully above, Ms. Galassini does not have an as-applied challenge in this case.  Moreover, due to this Court's holding that the statutory definition of political committee is facially vague as applied to everyone, it would not be appropriate to limit an injunction solely to certain groups of people.

At oral argument, Plaintiff asserted that the Ninth Circuit Court of Appeals' decision in *Canyon Ferry* supports her position that an "as-applied" injunction is appropriate in this case.  However, *Canyon Ferry* is distinguishable in two important respects.  First, in *Canyon Ferry*, a complaint alleging violations of Montana's campaign finance laws was filed against the Plaintiff and that Plaintiff was ultimately found to be in violation of Montana's campaign finance laws.  556 F.3d at 1025.  As a result, the Montana law in *Canyon Ferry* was applied and enforced against the Plaintiff in that case.

*Canyon Ferry* is thus distinguishable from this case because, in this case, there was solely a threat of enforcement, but Arizona's campaign finance statutes were never actually enforced against Plaintiff.

Second, in *Canyon Ferry*, the Court of Appeals held that Montana's disclosure and reporting requirements unconstitutionally vague as applied to the Plaintiff's de minimus activities. *Id.* at 1029. In this case, the Court's holding is that Arizona's definition of political committee is unconstitutionally vague on its face, regardless of whether it is applied to large or small groups seeking to influence the results of an election. Accordingly, this case differs from *Canyon Ferry* because the Court in *Canyon Ferry* enjoined enforcement as applied to small groups because the Court held that the statute at issue in that case was unconstitutional only as applied to small groups.

Accordingly, the Court is prepared to issue an injunction that is consistent with its holdings in this case. Namely, this Court is prepared to issue an injunction that enjoins the enforcement of any statutes in Title 16, Chapter 6 of the Arizona Revised Statutes to the extent those statutes depend on the definition of political committee as set forth in Arizona Revised Statutes section 16-902.01(19). Based on the foregoing, within 5 days of the date of this Order, Plaintiff shall file a notice with the Court indicating whether she seeks such an injunction as a remedy in this case.

## IV.    CONCLUSION

Based on the foregoing,

**IT IS ORDERED** that Plaintiff's Motion for Summary Judgment (Doc. 82) is denied in part and granted in part as set forth herein.

**IT IS FURTHER ORDERED** that, within 5 days of the date of this Order, Plaintiff shall file a notice with this Court indicating whether she seeks an injunction consistent with this Order.

**IT IS FURTHER ORDERED** that the State of Arizona's Motion for Summary Judgment (Doc. 83) is denied.

**IT IS FURTHER ORDERED** that the Town of Fountain Hills' Motion for

1    Summary Judgment (Doc. 84) is denied.

2           Dated this 30th day of September, 2013.

3

4

5           _____

6                        James A. Teilborg
                 Senior United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28